**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

**CASE NO.**

LSM TECHNOLOGIES PTY LTD,
an Australian corporation,

       Plaintiff,

v.

THE SY-KLONE COMPANY, LLC,
A Delaware limited liability company,
and LYONS AIRCONDITIONING SERVICES (WA)
PTY LTD, an Australian corporation,

       Defendants.

_____/

**<u>COMPLAINT AND DEMAND FOR JURY TRIAL</u>**

Plaintiff, LSM Technologies Pty Ltd ("LSM"), by and through undersigned counsel, hereby sues Defendants The Sy-Klone Company, LLC ("Sy-Klone") and Lyons Airconditioning Services (WA) Pty Ltd ("Lyons"), as follows:

**<u>Jurisdiction and Venue</u>**

1.     LSM is an Australian corporation, with its principal place of business in Australia. A "Pty Ltd," under Australian law, is the equivalent of a US corporation. The sole shareholder of LSM is LSM Group, Holdings Pty Ltd, which is also an Australian corporation, with its principal place of business in Australia. The sole shareholder of LSM Group is LSM Group, Holdings Trust, an Australian Trust, whose trustees and beneficiaries are two individuals, who are citizens of Australia, Peter and Robyn Woodford.

2.     Defendant Sy-Klone is a Florida limited liability company. Upon information and belief, its members are Sy-Klone Holdings Incorporated, a Florida corporation, and Skip I, LLC,

a Florida limited liability company, whose members, in turn, are trusts and individuals who are citizens of the United States.  Sy-Klone is *sui juris*.

3.     Defendant Lyons is an Australian corporation, with its principal place of business in Perth, Australia.

4.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332, and the principles of supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  The amount in controversy, exclusive of interest and costs, exceeds $75,000.00.

5.     Venue is proper in the Jacksonville Division of the Middle District of Florida pursuant to 28 U.S.C. § 1391(b)(2) & (3), where a substantial part of the events or omissions giving rise to the claims occurred, where Defendant Sy-Klone is subject to personal jurisdiction, and pursuant to the agreements of LSM and Sy-Klone.

6.     This Court has personal jurisdiction over Defendant Lyons, since it transacts business within this State, and/or has an office or agency in this State; has committed tortious acts or omissions within this State; has committed tortious injury in this State caused by an act or omission outside this State and regularly does or solicits business, or engages in other persistent courses of conduct, or derives substantial revenue from goods, purchased, used or consumed or services rendered in this State.  The activities of Defendant Lyons within this State are substantial and not isolated.  In addition, this action arises out of transactions and operations connected with and incidental to Defendant Lyons's business within this State.

7.     Among other things, Lyons has made continuous and ongoing purchases of products from Sy-Klone in the State of Florida.  In connection with that business, representatives of Lyons have regularly and repeatedly exchanged communications with Sy-Klone in this State,

made payments to Sy-Klone in this State, and on information and belief, have travelled to the United States to meet Sy-Klone representatives in this State.

8.      As well, and as detailed below, Lyons has actively engaged in a conspiracy and other misconduct with Sy-Klone in this State, involving ongoing communications and coordination with Sy-Klone, and commission of acts in furtherance of the conspiracy, as a result of which Sy-Klone's contacts with this State are imputed to Lyons.

## GENERAL ALLEGATIONS

### Sy-Klone's RESPA Systems

9.      Sy-Klone designs and produces air cleaning systems, which are used to provide clean air inside the cabins of heavy machinery and equipment used in mining operations, agriculture, fire and rescue, demolition and other applications.  In simple terms, the systems consist of a unit with a replaceable filtration system, through which air is cleaned and circulated into an enclosed cabin area.

10.     Sy-Klone's systems are in demand throughout Australia, which has a large mining industry.

### The Parties' Relationship and Prior Litigation

11.     LSM was established in 2002 and developed a reputation as a leading supplier of occupational health and safety technology and engineering services to Australian heavy industry, including mining, shipping, construction, farming, and refining.  It has developed its own line of products, which it continues to support and market under various trademarks, including TyreGuard Tyre® Monitoring System, TankCare® Air Breather and Filtration Technology®, and Collision Avoidance Systems (hereafter, "LSM Products").

12.     Among other customers, LSM sold its Products to Rio Tinto Services Limited ("Rio Tinto"), a multi-national mining conglomerate headquartered in Melbourne, Australia.

13.     In 2008, LSM entered into a Master Dealer Agreement ("First MDA") with Sy-Klone, pursuant to which LSM was granted the right to exclusively sell and distribute Sy-Klone branded products throughout Australia, New Zealand, PNG, Fiji, New Caledonia, and the surrounding islands (the "Territory," as defined in the First MDA), along with the LSM Products.

14.     Through its ongoing investment of time and money, LSM successfully developed a market for Sy-Klone's products in Australia.  In addition to other engineering products LSM sold and offered prior to the First MDA, LSM developed a reputation as a supplier of air cleaning systems, and a business with substantial goodwill.

15.     LSM also became a major supplier of Sy-Klone air cleaning products to Rio Tinto. The supply relationship was confirmed through a set of formal supply contracts that were renewed on an ongoing basis by Rio Tinto.

16.     Sy-Klone has, in turn, benefitted from LSM's success, the revenue from its ongoing sales to LSM, and the development of LSM's business reputation and goodwill.

17.     During the course of the parties' relationship, LSM regularly provided Sy-Klone with confidential and proprietary information about LSM's business, including LSM's procurement strategies, marketing strategies, business plans, concepts, and market information relating to current and potential retailers, customers, suppliers, and competitors. LSM provided Sy-Klone with confidential information about LSM's Products, as well.

18.     Sy-Klone knowingly encouraged LSM to provide this confidential information and repose its trust in Sy-Klone, which Sy-Klone accepted, providing its counsel and advice to LSM on an ongoing basis, both on LSM's Sy-Klone business and its LSM Products business.

19.     In or about 2019, however, Sy-Klone's ownership changed, and relationships with its distributors such as LSM deteriorated.

20.     Disregarding the successful past history with LSM, and the controlling contractual provisions in the First MDA, Sy-Klone purported to terminate the First MDA, and filed a lawsuit in Jacksonville, Florida in 2019, seeking to avoid its payment and other obligations to LSM under the First MDA.

21.     The termination was unjustified and wrongful, and after the lawsuit was removed to Federal Court, as case number 3:19-cv-446-J-39JBT, LSM countersued LSM for $4.9 million.

22.     In February of 2020, Sy-Klone agreed to dismiss the lawsuit, and reinstated a Master Dealer Agreement with LSM ("Second MDA"), a true and correct copy of which is referenced as Exhibit "A" hereto.  The Second MDA replaced and superseded the First MDA.

23.     As a companion to the Second MDA, the parties also entered into a Settlement Agreement (referenced as Exhibit "B" hereto) and a Mutual Nondisclosure Agreement ("NDA") (referenced as Exhibit "C" hereto).[1]

24.     The NDA reflected the parties' prior course of dealing, during which LSM had regularly provided Sy-Klone with LSM's confidential business information as described herein, and Sy-Klone provided LSM with advice and counsel.

25.     In order to restore the relationship that the parties had had for years, Russell Beard, who has served as Sy-Klone's representative in the lawsuit and was acting as its CEO, assured LSM he would remain actively involved in the relationship.

---

[1] The agreements contain confidentiality provisions and, accordingly, LSM will seek to file them separately under seal, after conferring with Sy-Klone.

26.     In fact, the Second MDA required Mr. Beard to meet with Mr. Woodford of LSM on a quarterly basis to "review and discuss" Sy-Klone's business with LSM.

### The Second MDA

27.     The Second MDA re-confirmed LSM's status as a Master Dealer for Sy-Klone products in the Territory, for a term of two (2) years.

28.     Like the First MDA, the Second MDA confirmed that LSM would receive "Master Dealer Pricing."  ¶ 5.  That pricing was lower than pricing provided to other purchasers, who were not Master Dealers.

29.     The Second MDA granted Sy-Klone the right to sell Sy-Klone branded products to non-Master Dealers, called "Solutions Providers," in the Territory.  It also ensured that, in the event Sy-Klone sought to sell Sy-Klone branded products in the Territory through any non-Master Dealer, LSM would be compensated by Sy-Klone based on the amount of product sold to the sub-dealers.

30.     Lyons was the primary non-Master Dealer in the Territory to which Sy-Klone sold during the term of the Second MDA.

31.     LSM continued to invest in the development of the relationship and the market for Sy-Klone products, and successfully performed during the term of the Second MDA.

32.     Indeed, notwithstanding the challenges of conducting business during the COVID pandemic, LSM's sales of Sy-Klone product remained robust.

33.     Among other purchasers, LSM continued as the supplier of Sy-Klone products to Rio Tinto, through a renewed supply contract entered into in early 2020.

34.     LSM also received compensation from Sy-Klone for some limited sales of Sy-Klone product through Lyons.  Pursuant to the terms of the Second MDA, the compensation was

to be for the difference in pricing that Sy-Klone offered to Lyons, which was not a Master Dealer, compared to the pricing Sy-Klone offered to LSM, which was a Master Dealer.

35.     Critically, the Second MDA also contained extensive provisions governing the parties' conduct and treatment of each other.

36.      For example, Sy-Klone agreed, in paragraph 4 of the Second MDA:

> to conduct its performance under this Agreement in a manner designed to preserve and enhance the goodwill associated with the name and reputation of the Products. Sy-Klone will do nothing that would tend to discredit, dishonor, reflect adversely upon, or in any way injure the reputation of LSM or any of the Products, or engage in any unfair marketing practices, or engage in any activity that would undermine LSM's business practices in any way.

37.  Sy-Klone further agreed, for itself and for its:

> agents, representatives, employees and distributors to whom it sells the Products, . . . to conduct any and all of their activities performed in connection with this Agreement in a lawful manner consistent with the highest standards of fair trade, fair competition and business ethics and agree to abide by the following Sy-Klone Ethic's Policy.

*Id.* at ¶ 4.

38.     Sy-Klone represented that it would "comply with all antitrust and competition laws of the United States and those of any other country in which Sy-Klone conducts business," including "collusive bidding, . . . rotated low bids, collusive price estimating systems, boycotting customers and vendors, and sharing of the business market." *Id.* at ¶ 4(d).

39.     The Second MDA then included a detailed section on General Conduct and Competition, emphasizing that the Parties "will not engage in any deceptive, misleading, illegal or unethical business practice or conduct." *Id.* at ¶ 15.

40.     These provisions reflected the relationship of trust and confidence between LSM and Sy-Klone that existed prior to the First MDA, including Sy-Klone's role as a fiduciary in its relationship with LSM, and Sy-Klone's commitment to restoring and maintaining it..

41.     Sy-Klone also took affirmative steps to repair the damage it caused through the unjustified termination of the First MDA, by continuing to solicit and receive confidential information about LSM's Products, including technologies and marketing strategies LSM was developing. Sy-Klone also provided advice and counsel to LSM regarding LSM's general business, upon which LSM relied.

**The Rio Tinto Bid Process**

42.     In or about March of 2021, during the term of the Second MDA, Rio Tinto issued a request for proposal to renew the supply contract for air cleaning products for its business in Australia. Rio Tinto's proposal was for a longer term than the prior contracts. Rather than a one-year term, Rio Tinto was offering a 3-year term, with a renewal option.

43.     LSM, based on its ongoing business relationship with Rio Tinto and as the Sy-Klone Master Dealer in Australia, was uniquely positioned to bid and be selected to continue the relationship selling Sy-Klone product to Rio Tinto. LSM had been supplying its LSM Products to Rio Tinto for more than two decades, and the Sy-Klone products for nearly fifteen years. LSM understood that it remained Rio Tinto's preferred choice for the on-going Sy-Klone supply contract.

44.     Indeed, Rio Tinto had acknowledged various advantages that LSM offered as a supplier:  Like Rio Tinto, LSM had a national presence in Australia, not just in the Western Australia area, where Rio Tinto's iron ore mining sites were located.  As well, since LSM did not supply general HVAC services or products, a different line from air cleaning products like those manufactured by Sy-Klone or the LSM Products, it was not perceived as a competitor to the companies that did supply HVAC equipment to Rio Tinto.  LSM also had proven experience as a long-term supplier to Rio Tinto, with extensive technical expertise related to Sy-Klone products.

8

45.     As a practical matter, moreover, Rio Tinto required an ongoing supply of Sy-Klone products, which were the only suitable components for a very large number of the mining machines used by Rio Tinto.  The established patents and protections on Sy-Klone's products prevented Rio Tinto from using substitute parts from another manufacturer.  And, the costs of changing its fleet of mining equipment to eliminate the need for Sy-Klone product would have been prohibitively expensive.

46.     LSM enlisted Sy-Klone's support with the bid, providing Sy-Klone's representatives with detailed information about LSM's bid, the process, and LSM's efforts to ensure its selection.  The information (hereafter, "Protected Information") LSM disclosed to Sy-Klone was proprietary, confidential, and trade secret, and it was protected from disclosure by Sy-Klone under both the Second MDA and the NDA.

47.     Most of the Protected Information also constituted trade secrets (collectively, "Trade Secrets"), such as LSM's pricing information (including costs, margins, pricing and pricing policies), the details of the services LSM proposed to provide to Rio Tinto (including information disclosed by Rio Tinto to LSM not otherwise known by or available to the public), LSM's strategies for procuring the Rio Tinto and other business, LSM's marketing information and strategies, LSM's budgets, forecasts and projections, and its business conditions, prospects, plans, procedures and affairs.

48.     The Protected Information disclosed and discussed between LSM and Sy-Klone also included critical – and highly confidential – information about ongoing negotiations between them related to the status and extension of their dealer relationship.

49.     This last category of Protected Information was especially critical, since Rio Tinto had asked as part of its due diligence, for assurances from Sy-Klone about the status of the dealer relationship between Sy-Klone and LSM.

50.     Throughout this process, LSM reposed its trust and confidence in Sy-Klone, reasonably believing that Sy-Klone would work in good faith to support LSM and its effort to continue its long-standing relationship supplying Sy-Klone product to Rio Tinto, as well as the general development of LSM's business, reputation and goodwill.

51.     In fact, the Second MDA specifically required that LSM "coordinate its sales efforts with Sy-Klone [, and] . . . convey to Sy-Klone any information which may be of value to Sy-Klone that comes to LSM's attention concerning market conditions, competition, pricing, customers and prospects."  ¶ 3.  As well, including through quarterly meetings required between Peter Woodford of LSM and Russell Beard of Sy-Klone, LSM was obligated to "review and discuss" with Sy-Klone its "(i) business, (ii) markets, (iii) customers, (iv) sales opportunities and (v) projections for future Product needs."  *Id.*

52.     Sy-Klone, through Mr. Beard during those meetings and in its general communications and conduct toward LSM, accepted LSM's trust and confidence, assuring Mr. Woodford that Sy-Klone would protect LSM's Protected Information and act to support and encourage LSM's business however possible.  At Mr. Beard's encouragement, LSM provided Mr. Beard with detailed information on LSM's plans to develop further proprietary vehicle anti-collision technologies, which were separate from LSM's Sy-Klone business.

53.     Among other communications, Mr. Woodford provided Mr. Beard detailed Protected Information related to the Rio Tinto bid process by email dated May 21, 2021.  The Protected Information included specific details about the business relationship and history between

LSM and Rio Tinto, LSM's marketing information and strategies in presenting the bid to Rio Tinto, LSM's forecasts and projections regarding Rio Tinto, and LSM's general business plans, prospects and affairs.

54.     The discussions also covered LSM's Products, and its plans to expand those lines and develop additional, proprietary, vehicle anti-collision technologies, as well as continuing to expand the Sy-Klone business.  LSM provided Protected Information about its Products,  such as the TyreGuard Tyre® Monitoring System, TankCare® Air Breather and Filtration Technology®, Collision Avoidance Systems, and the various services LSM provided to support its Products.  Mr. Beard actively solicited this exchange of information, and engaged in providing general business advice to LSM.

55.     Mr. Beard, in turn, provided the information to Austin Browne, a Vice President of Sales and Marketing at Sy-Klone.  Unfortunately, undisclosed to LSM, Mr. Browne was, upon information and belief, also extensively involved in communications between Sy-Klone and Lyons and in ensuring Lyons, not LSM, obtained the Rio Tinto bid.

56.     Mr. Woodford had quarterly calls with Mr. Beard throughout 2021, including on July 12 and October 12, 2021.  During those calls, Mr. Woodford provided more Protected Information about LSM's business, its revenues and growth, discussions with specific LSM customers, including Rio Tinto and the pending bid, LSM's proposed additional investment in the Sy-Klone business and its development, the status of the master dealer relationship, as well as LSM's marketing information and strategies, budgets, forecasts and projections, and its general business conditions, prospects, plans, procedures, affairs, and procurement strategies.

57.     During all of these communications, Mr. Woodford emphasized that the Protected Information was to be held by Mr. Beard and Sy-Klone in confidence, including pursuant to the

11

Second MDA and the NDA.  Mr. Beard assured Mr. Woodford that it would be, and that LSM had Sy-Klone's full support.

58.     LSM, in turn, asked Sy-Klone to provide a letter of comfort to Rio Tinto, providing appropriate assurances.

**THE MISCONDUCT:**
**Sy-Klone And Lyons Conspire To Rig The Rio Tinto Bid And Cut Out LSM**

59.     Unfortunately, in breach of its obligations under the Second MDA and NDA, and in violation of applicable law, Sy-Klone misappropriated and mis-used LSM's Protected Information and Trade Secrets and conspired with Lyons to interfere with and undermine LSM's bid to Rio Tinto, instead steering the Rio Tinto supply contract to Lyons.

60.     Sy-Klone's misconduct was implemented as part of a concerted strategy to take direct control over the valuable supply relationship with Rio Tinto, divesting LSM of its Master Dealer status and eliminating the significant role LSM had played for more than a dozen years as the Sy-Klone supplier to Rio Tinto.  Instead, Lyons – a small supplier, without Master Dealer status, highly dependent on and controlled by Sy-Klone – would serve as Sy-Klone's proxy, ensuring that Sy-Klone would directly control the supply relationship to Rio Tinto.

61.     The conspiracy between Sy-Klone and Lyons unfolded as detailed in the following paragraphs.

62.     First, Sy-Klone refused to provide the requested assurance to Rio Tinto.  Rather than confirming that LSM was a suitable partner to supply Sy-Klone product to Rio Tinto, and was supported by Sy-Klone, Sy-Klone insisted on sending a diluted statement directly to Rio Tinto in May of 2021, which made no mention of LSM.  Instead, the statement addressed only Sy-Klone's general intent to continue to supply its products in Australia.  That diluted statement

effectively wrote LSM out of the Rio Tinto bid process, signaling that Sy-Klone was unwilling to provide the assurance about LSM that Rio Tinto was requesting.

63.     Then, during this same period, while the Second MDA and the NDA were still in effect, Sy-Klone leaked LSM's Protected Information and Trade Secrets to Lyons, whom Sy-Klone had been actively grooming as its proxy to displace LSM in Australia.

64.     The Protected Information and Trade Secrets that were leaked included disclosure about LSM's pricing, the terms of its bid to Rio Tinto, and critically, the conditions, prospects and status of LSM's business.   Among other Protected Information disclosed to Lyons, Sy-Klone indicated that it had no intention of continuing the Master Dealer relationship with LSM and would not be renewing the Second MDA.

65.     Indeed, after the fact, a representative of Lyons confirmed to Peter Woodford, LSM's principal, that he had known for months LSM was being pushed out of the Sy-Klone business.

66.     In the meantime, Sy-Klone and Lyons worked together, using LSM's Protected Information and Trade Secrets, to position Lyons as the "only game in town" to continue to supply Sy-Klone product to Rio Tinto.

67.     On information and belief, Lyons submitted a competing bid to Rio Tinto, reflecting preferential pricing offered by Sy-Klone, ensuring that Lyons would beat out LSM.   In concert, Lyons advised Rio Tinto that Sy-Klone would not support LSM moving forward and that only Lyons would have access to Sy-Klone product to supply Rio Tinto.

68.     Without collusion between the Defendants, Lyons could not have underbid LSM. The preferential pricing provided by Sy-Klone to LSM as a Master Dealer, with the highly-competitive profit margin LSM applied, would have resulted in a bid by LSM that was significantly

lower than what Lyons could have offered, based on the higher pricing Sy-Klone would have had to provide to Lyons, in order to comply with the Second MDA.

69.     Upon information and belief, Sy-Klone had to provide Lyons with pricing at or below the pricing offered to LSM, in order for Lyons to underbid LSM.

70.     Then, in order to facilitate Rio Tinto's transition to Lyons, and ensure there was no disruption in the supply chain, Sy-Klone arranged to ship additional product, ensuring that Lyons would be in position to supply the required quantity to Rio Tinto upon expiration of the Second MDA.

71.     Since shipments take at least 26 weeks to arrive by sea, the shipments were necessarily made months before their receipt, while the Second MDA was still in effect, prior to its expiration in February of 2022.

72.     Adding insult to injury, Sy-Klone concealed the shipments from LSM, and failed to pay LSM the compensation it was due, pursuant to the Second MDA, for the product shipped to supply to Rio Tinto.

73.     In or about October of 2021, Rio Tinto advised LSM that it had rejected LSM's offer, and would not award LSM the new contract.

74.     Throughout this process Sy-Klone concealed from LSM the fact that Sy-Klone had already decided to terminate LSM as a dealer and cut its supply of Sy-Klone product.  As a pretense to appease LSM, and ensure LSM would not disrupt the supply relationship with Rio Tinto, Sy-Klone disingenuously suggested to LSM it was willing to continue to negotiate a renewal of the MDA.

75.     Sy-Klone, as well, concealed that it had conspired with Lyons to rig the Rio Tinto bid, and refused to disclose to LSM that Lyons had succeeded in being awarded the contract.

76.     *The misconduct by Sy-Klone and Lyons detailed in paragraphs 59-75 will be referred to hereafter as the "Misconduct."*

77.     All conditions precedent to the bringing of this action have been satisfied, performed, excused or would be futile.

78.     LSM has been obligated to retain undersigned counsel and is obligated to pay their reasonable fees.

**Count One**
**<u>(Breach of Second MDA – Defendant Sy-Klone)</u>**

79.     LSM incorporates the allegations in paragraphs 1 through 78, above.

80.     This is an action for breach of contract.

81.     Sy-Klone and LSM entered into the Second MDA in February 2020.

82.     Sy-Klone's Misconduct breached the Agreement, including by misappropriating and misusing LSM's Protected Information and Trade Secrets and conspiring with Lyons to interfere with and undermine LSM's bid for a contract to supply Sy-Klone product to Rio Tinto, instead rigging the bid process to ensure that Lyons was awarded the Rio Tinto contract.

83.     Among other breaches, Sy-Klone refused to provide assurances to Rio Tinto that LSM was a suitable partner to supply Sy-Klone product to Rio Tinto, and was supported by Sy-Klone.

84.     Sy-Klone also leaked LSM's Protected Information to Lyons, whom Sy-Klone had been actively grooming as a proxy to displace LSM in Australia.  The leaked Protected Information included disclosure about LSM's pricing, the terms of its bid to Rio Tinto, and critically, the conditions, prospects, and status of LSM's business, and its strategies for procuring and developing additional business.  Among other Protected Information disclosed to Lyons, Sy-Klone disclosed

that it had no intention of continuing the Master Dealer relationship with LSM, and would not be renewing the Second MDA, many months before its date of expiration.

85.     Sy-Klone then actively conspired with Lyons to use LSM's Protected Information, positioning Lyons as the only company in Australia that could continue to supply the Sy-Klone product Rio Tinto required, including by offering Lyons preferential pricing (at or below the preferred Master Dealer pricing Sy-Klone was to exclusively offer LSM) for a competing bid to Rio Tinto, which Lyons submitted and ultimately won.

86.     Acting in concert with Lyons, Sy-Klone advised Rio Tinto that Sy-Klone would not support LSM moving forward, and that only Lyons would have access to Sy-Klone product to supply Rio Tinto.  Then, in order to facilitate Rio Tinto's transition to Lyons, and ensure there was no disruption in the supply chain, Sy-Klone arranged to ship additional product, ensuring that Lyons would be in position to supply the required quantity to Rio Tinto upon expiration of the Second MDA.

87.     In breach of Paragraph 2 of the Second MDA, Sy-Klone concealed these additional shipments from LSM, and failed to pay LSM the compensation it was due, pursuant to the Second MDA.

88.     Throughout this process, moreover, Sy-Klone concealed from LSM the fact that Sy-Klone had already decided to terminate LSM as a dealer and cut its supply of Sy-Klone product. As a pretense to appease LSM, and ensure LSM would not disrupt the supply relationship with Rio Tinto until Lyons had the inventory needed to supply Rio Tinto, Sy-Klone disingenuously suggested to LSM it was willing to continue negotiating a renewal of the MDA.

89.     Sy-Klone concealed that it had conspired with Lyons to rig the Rio Tinto bid and refused to disclose to LSM that Lyons had succeeded in being awarded the contract.

90.     Sy-Klone's Misconduct discredited and reflected adversely upon LSM, injured LSM's reputation and undermined its business practices as a dealer of Sy-Klone products, in breach of Paragraph 4 of the Second MDA.  Sy-Klone's Misconduct also failed to comply with the highest standards of fair trade, fair competition and business ethics, or to comply with Sy-Klone's Ethics Policy, in breach of Paragraph 4.

91.     Sy-Klone's Misconduct constituted deceptive, misleading, illegal and unethical business practices and conduct – breaching the standards set forth in Paragraph 15 of the Second MDA.

92.     Sy-Klone's Misconduct also breached its implied obligations of good faith and fair dealing.

93.     As a direct and proximate cause of Sy-Klone's breaches, LSM has suffered damages.

WHEREFORE, LSM demands entry of judgment against Sy-Klone for damages, including lost profits, damage to LSM's reputation and goodwill, and all other damages suffered as a consequence of Sy-Klone's breaches, prejudgment interest, costs and attorneys' fees pursuant to Paragraph 24 of the Second MDA, and such other and further relief the Court deems appropriate.

**Count Two**
**(Breach of the NDA –  against Defendant Sy-Klone)**

94.      LSM incorporates the allegations in paragraphs 1 through 78, above.

95.     This is an action for breach of the NDA.

96.     The parties entered into the NDA, which obligated Sy-Klone to keep LSM's Protected Information confidential.

97.     LSM relied on the protections of the NDA and disclosed to Sy-Klone's representatives detailed information about LSM's bid to Rio Tinto, LSM's efforts to ensure its

selection by Rio Tinto, and LSM's general business procurement and development strategies. The Protected Information LSM disclosed to Sy-Klone was proprietary, confidential, and trade secret, and it was protected from disclosure by Sy-Klone under both the Second MDA and the NDA.

98.     The Protected Information included Trade Secrets, such as LSM's pricing information (including costs, margins, pricing and pricing policies), the details of the services LSM proposed to provide to Rio Tinto in connection with the 2021 bid process (including information disclosed by Rio Tinto to LSM not otherwise known by or available to the public), LSM's marketing information and strategies, LSM's budgets, forecasts and projections, and its business conditions, prospects, plans, procedures, procurement strategies and affairs.

99.     The Protected Information disclosed and discussed between LSM and Sy-Klone also included critical – and highly confidential – information about ongoing negotiations between LSM and Sy-Klone related to the status and extension of their dealer relationship.

100.     Sy-Klone breached the NDA by improperly disclosing LSM's Protected Information, including to Lyons in connection with their Misconduct and conspiracy to interfere with and undermine LSM's bid for a contract to supply Sy-Klone product to Rio Tinto, instead rigging the bid process to ensure that Rio Tinto awarded the contract to Lyons.

101.     As a direct and proximate result, LSM suffered damages.

WHEREFORE, LSM demands entry of judgment against Sy-Klone for damages, including lost profits, damage to LSM's reputation and goodwill, and all other damages suffered as a consequence of Sy-Klone's breaches, prejudgment interest, costs, and such other and further relief the Court deems appropriate.

## Count Three
## (Breach of Fiduciary Duties – against Defendant Sy-Klone)

102.     LSM incorporates the allegations in paragraphs 1 through 78, above.

103.   This is an action for breach of fiduciary duties.

104.   Sy-Klone and LSM developed a confidential relationship whereby LSM provided Sy-Klone with its confidential business information relating to LSM's procurement strategies, proprietary business plans, positioning in the market place relating to retailers, customers, and suppliers, both relating to LSM's Sy-Klone business and non-Sy-Klone business.

105.   Throughout the term of the Second MDA, LSM reposed its trust and confidence in Sy-Klone, reasonably believing that Sy-Klone would work in good faith to support LSM and its effort to continue its long-standing relationship supplying Sy-Klone product to Rio Tinto, and to generally develop LSM's business, reputation and goodwill.

106.   Sy-Klone, in its communications and conduct toward LSM knowingly encouraged and accepted LSM's trust and confidence.

107.   Defendant Sy-Klone was regularly provided with and encouraged LSM to provide confidential and proprietary information relating to LSM's procurement strategies, specifically including the Protected Information, and was regularly consulted by LSM on confidential matters relating to LSM's business, including both Sy-Klone products and LSM's Products.

108.   A relationship of trust and confidence developed between LSM and Sy-Klone, imposing on Sy-Klone duties as a fiduciary in its relationship with LSM.  The duties included a duty of loyalty, care, good faith, and confidentiality.

109.   Under these circumstances, a relationship of trust and confidence existed between LSM and Sy-Klone.

110.   Instead, Sy-Klone breached its fiduciary duties to LSM, through its Misconduct, including by misappropriating and misusing LSM's Protected Information and conspiring with

Lyons to interfere with and undermine LSM's bid for a contract to supply Sy-Klone product to Rio Tinto, instead rigging the bid process to ensure that Rio Tinto awarded the contract to Lyons.

111.    The Misconduct also damaged LSM's business, reputation and goodwill.

112.    As a direct and proximate result of Sy-Klone's breaches, LSM suffered damage.

WHEREFORE, LSM demands entry of judgment against Sy-Klone for damages, including lost profits, damage to LSM's reputation and goodwill, and all other damages suffered as a consequence of Sy-Klone's breaches, as well as punitive damages, prejudgment interest, costs, and such other and further relief the Court deems appropriate.

### Count Four
### (Aiding and Abetting Breaches of Fiduciary Duties – Against Defendant Lyons)

113.    LSM incorporates the allegations of paragraphs 1-78, above.

114.    This is an action for aiding and abetting breaches of fiduciary duties.

115.    A relationship of trust and confidence developed between LSM and Sy-Klone, imposing on Sy-Klone duties as a fiduciary in its relationship with LSM.

116.    The duties included duties of loyalty, care, good faith, and confidentiality.

117.    Throughout the term of the Second MDA, LSM reposed its trust and confidence in Sy-Klone, reasonably believing that Sy-Klone would work in good faith to support LSM, and the development of LSM's business, including LSM's effort to continue its long-standing relationship supplying Sy-Klone product to Rio Tinto.

118.    Sy-Klone, in its communications and conduct toward LSM, accepted LSM's trust and confidence.

119.    Sy-Klone breached its fiduciary duties to LSM, through its Misconduct, including by misappropriating and misusing LSM's Protected Information and conspiring with Lyons to

interfere with and undermine LSM's bid for a contract to supply Sy-Klone product to Rio Tinto, instead rigging the bid process to ensure that Rio Tinto awarded the supply contract to Lyons.

120.    The Misconduct also damaged LSM's business, reputation and goodwill.

121.    Lyons knew of Sy-Klone's breaches of its fiduciary duties to LSM.

122.    Lyons knowingly provided substantial assistance or encouragement in the breaches by actively conspiring with Sy-Klone to exploit the breaches to its advantage in procuring the Rio Tinto supply contract.   Among other misconduct, Lyons induced Sy-Klone to disclose LSM's Protected Information and Trade Secrets, and actively worked with Sy-Klone to use the Protected Information and Trade Secrets to ensure that Lyons, and not LSM, was awarded the Rio Tinto contract.

123.    As a direct and proximate result of the Misconduct and breaches of fiduciary duty, LSM suffered damage.

WHEREFORE, LSM demands entry of judgment against Lyons for damages, including lost profits, damage to LSM's reputation and goodwill, and all other damages suffered as a consequence of the Misconduct and breaches, as well as punitive damages, prejudgment interest, costs, and such other and further relief the Court deems appropriate.

**Count Five**
**(Misappropriation of Trade Secrets – Against All Defendants)**

124.    LSM incorporates the allegations of paragraphs 1-78, above.

125.    This is an action for misappropriation of trade secrets, pursuant to 18 U.S.C. § 1836, et seq. and Florida Statutes ch. 688.

126.    Defendants misappropriated LSM's Trade Secrets by improper means.

127.    The Trade Secrets, as detailed above, include LSM's pricing information (including costs, margins, pricing and pricing policies), the details of the services LSM proposed to provide

to Rio Tinto in connection with the 2021 bid process (including information disclosed by Rio Tinto to LSM not otherwise known by or available to the public), LSM's marketing information and procurement strategies, LSM's budgets, forecasts and projections, and its business conditions, prospects, plans, procedures, business development and procurement strategies, and affairs.

128.    The Trade Secrets are information that derived independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use.

129.    LSM took reasonable measures to preserve the Trade Secrets, and not disclose them to third parties, except to Sy-Klone, and only Sy-Klone, in total confidence.

130.    Defendants, with intent to convert the Trade Secrets, which are related to products used and intended for use in interstate and foreign commerce, and without authorization, appropriated the Trade Secrets, transmitted and conveyed the Trade Secret information and conspired with one another to do so.

131.    The Trade Secrets were acquired by Sy-Klone under circumstances giving rise to a duty to maintain its secrecy and limit its use.

132.    Sy-Klone misappropriated the Trade Secrets through its Misconduct, including by misusing the Trade Secrets, improperly disclosing the Trade Secret information to Lyons and Rio Tinto, as part of the Defendants' conspiracy to interfere with and undermine LSM's bid for a contract to supply Sy-Klone product to Rio Tinto, instead rigging the bid process to ensure that Rio Tinto awarded the supply contract to Lyons.

133.    Lyons, in turn, knew and had reason to know that Sy-Klone acquired the Trade Secrets under circumstances giving rise to a duty to maintain them, and that Sy-Klone owed a duty

to LSM to maintain the secrecy of the Trade Secrets and limit their use, and that the Trade Secrets were converted without authorization.

134.    The Misconduct of Sy-Klone and Lyons was willful and malicious, undertaken with intent and knowledge that the offense would injure LSM.

135.    Acts in furtherance of the Misconduct were committed in the United States, including the misappropriation and improper disclosure of the Trade Secrets by Sy-Klone, which is an organization organized under the laws of the United States, or a State thereof.

136.    As a direct and proximate result of the Defendants' Misconduct, LSM suffered damages.

WHEREFORE, LSM demands entry of judgment against Sy-Klone and Lyons, jointly and severally, for damages, including for LSM's actual losses, for unjust enrichment, exemplary damages, and all other damages suffered as a consequence of Defendants' Misappropriation, prejudgment interest, costs and attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D) and Fla. Stat. § 688.05, and such other and further relief the Court deems appropriate.

**Count Six**
**(Tortious Interference with Business Relationship – Against All Defendants)**

137.    LSM incorporates the allegations contained in paragraphs 1-78, above.

138.    This is an action for tortious interference with a business relationship.

139.    Sy- Klone and Lyons engaged in Misconduct and unlawfully conspired to tortiously interfere with LSM's business relationship with Rio Tinto.

140.    Through their Misconduct, Sy-Klone and Lyons misappropriated and misused LSM's Protected Information to interfere with and undermine LSM's bid for a contract to supply Sy-Klone product to Rio Tinto, instead rigging the bid process to ensure that Rio Tinto awarded the contract to Lyons.

23

141.    Sy-Klone and Lyons had knowledge of the past and prospective business relationship between LSM and Rio Tinto.

142.    Defendants' interference was intentional and unjustified, and their Misconduct used improper means, including unlawful conspiracy, breaches of fiduciary duties and contractual obligations, and misappropriation of trade secrets.

143.    The intentional and unjustified interference was not privileged.

144.    As a direct and proximate result of Defendants' Misconduct, LSM suffered damages.

WHEREFORE, LSM demands entry of judgment against Sy-Klone and Lyons, jointly and severally, for damages, including lost profits, damage to LSM's reputation and goodwill, and all other damages suffered as a consequence of the interference, as well as punitive damages, prejudgment interest, costs, and such other and further relief the Court deems appropriate.

### Count Seven
### (Unfair Competition – Against All Defendants)

145.    LSM incorporates the allegations contained in paragraphs 1-78, above.

146.    This is an action for unfair competition,

147.    Sy-Klone and Lyons, through their Misconduct, unlawfully conspired and unfairly competed with LSM, in obtaining the Rio Tinto supply contract.

148.    Through their Misconduct, Sy-Klone and Lyons misappropriated and misused LSM's Protected Information to interfere with and undermine LSM's bid for the contract to supply Sy-Klone product to Rio Tinto, instead rigging the bid process to ensure that Rio Tinto was awarded the supply contract to Lyons, and damaged LSM's business, reputation and goodwill.

149.    As a result of Defendants' Misconduct, Plaintiff suffered damages.

150.     Defendants exercised their combined power acquired as a result of their power to control the supply of Sy-Klone product to the Territory and throttle LSM's ability to fairly compete for the Rio Tinto bid.

151.     The direct and proximate result of Defendant's unfair competition was to force LSM to lose the Rio Tinto supply contract, damage LSM's reputation and goodwill, and cause it damage.

WHEREFORE, LSM demands entry of judgment against Sy-Klone and Lyons, jointly and severally, for damages, including lost profits, damage to LSM's reputation and goodwill, and all other damages suffered as a consequence of the interference, as well as punitive damages, prejudgment interest, costs, and such other and further relief the Court deems appropriate.

### Count Eight
### (Conspiracy – Against All Defendants)

152.     LSM incorporates the allegations of paragraphs 1-78, above.

153.     This is an action for conspiracy.

154.     Sy-Klone and Lyons engaged in Misconduct and unlawfully conspired to tortiously interfere with LSM's business relationship with Rio Tinto, misappropriate LSM's Trade Secrets, breach fiduciary duties owed to LSM, and unfairly compete.

155.     Through their Misconduct, Sy-Klone and Lyons misappropriated and misused LSM's Protected Information to interfere with and undermine LSM's bid for a contract to supply Sy-Klone product to Rio Tinto, instead rigging the bid process to ensure that Rio Tinto awarded the contract to Lyons.

156.     As a result of Defendants' acts done in furtherance of the conspiracy, Plaintiff suffered damages.

157.    Defendants exercised their combined power acquired as a result of their power to control the supply of Sy-Klone product to the Territory and throttle LSM's ability to fairly compete for the Rio Tinto bid.

158.    By virtue of this combined power, Defendants acquired a peculiar and pronounced power of coercion over potential purchasers of Sy-Klone products, as evidence by the action they took and the Misconduct in which they engaged, to directly and proximately cause interference and harm to LSM.  In short, together, Sy-Klone and Lyons had the power to determine the fate of LSM's business, and whether or not it could fairly compete for the Rio Tinto supply contract. Based on Defendants' concerted action and Misconduct, LSM could not fairly compete.

159.    The direct and proximate result of Defendants' conspiracy was to force LSM to lose the Rio Tinto supply contract, damage LSM's business, reputation and goodwill, and cause it damage.

WHEREFORE, LSM demands entry of judgment against Sy-Klone and Lyons, jointly and severally, for damages, including lost profits, damage to LSM's reputation and goodwill, and all other damages suffered as a consequence of the interference, as well as punitive damages, prejudgment interest, costs, and such other and further relief the Court deems appropriate.

### Count Nine
### (Declaratory Judgment – Against Defendant Sy-Klone)

160.    LSM incorporates the allegations of paragraphs 1-78, above.

161.    This is an action for declaratory relief pursuant to 28 U.S.C. § 2201.

162.    As detailed above, Sy-Klone, by its Misconduct, has breached the Second MDA, including paragraphs 2, 4 and 15.

163.    Based on Sy-Klone's prior, material breaches of the Second MDA, LSM should be excused from any obligation to comply with restrictive covenants in paragraph 15 of the Second MDA.

164.    Sy-Klone, having breached the Second MDA, including paragraph 15, should be barred and precluded from seeking to enforce the covenants restricting the conduct of LSM's business.

165.    On information and belief, Sy-Klone will attempt to enforce the covenants regardless of its Misconduct.

166.    Accordingly, there is a substantial controversy between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

167.    Declaratory relief would serve a useful and important purpose in clarifying and settling the legal relations at issue, and would terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.

WHEREFORE LSM requests that this Court issue a judgment declaring (a) that based on Sy-Klone's prior breaches of the Second MDA, LSM is excused from, and Sy-Klone is permanently barred from enforcing, the restrictions on competition contained in paragraph 15; and (b) awarding LSM interest, costs, and attorneys' fees pursuant to paragraph 24 of the Second MDA, along with such other and further relief as may be permitted.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury of all issues so triable.


Dated: September 19, 2022.

Respectfully submitted,

By:  */s/ Kevin C. Kaplan*

Kevin C. Kaplan, Esq.
Florida Bar No.:  933848
kkaplan@coffeyburlington.com
lperez@coffeyburlington.com
service@coffeyburlington.com
Jared W. Whaley, Esq.
Florida Bar No.: 107774
jwhaley@coffeyburlington.com
**COFFEY BURLINGTON, P.L.**
2601 South Bayshore Drive, Penthouse One
Miami, Florida 33133
Telephone: (305) 858-2900
Facsimile:  (305) 858-5261

– and –

David C. Reeves, Esq.
dcreeves@mppkj.com
jpinkham@mppkj.com
**MOSELEY, PRICHARD, PARRISH, KNIGHT & JONES, P.A.**
501 West Bay Street
Jacksonville, Florida 32202
Telephone: (904) 356-1306
Facsimile:  (904) 356-0194

*Counsel for LSM Technologies Pty LTD*